2017 UT App 219

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
SANTIAGO DIAZ CRESPO,
Appellant.

Opinion
No. 20150631-CA
Filed November 24, 2017

Third District Court, Salt Lake Department
The Honorable Katie Bernards-Goodman
No. 131902928

Samuel P. Newton, Attorney for Appellant

Sean D. Reyes and Karen A. Klucznik, Attorneys
for Appellee

JUDGE KATE A. TOOMEY authored this Opinion, in which JUDGES
DAVID N. MORTENSEN and JILL M. POHLMAN concurred.

TOOMEY, Judge:

¶1     Faced with a rape accusation that he believed was
motivated by a disputed drug debt, Santiago Diaz Crespo asked
his associate (Codefendant) to offer the victim (Victim) cocaine
to "get him in the door" to talk to Victim about retracting the
rape accusation. Shortly after Victim let Codefendant into her
apartment to smoke crack cocaine and talk about the accusation,
Crespo appeared in her doorway, gun drawn, and fired three
shots. A few moments later, Crespo and Codefendant ran from
Victim's apartment, leaving her dead. They were each charged
with murder; aggravated burglary; and purchase, transfer,
possession or use of a firearm by a restricted person. In exchange
for dismissing the murder charge against him, Codefendant

agreed to plead guilty to the other charges and to testify against Crespo at trial.

¶2 Crespo was convicted and now appeals, claiming that his conviction was not supported by sufficient evidence due to the "self-serving and inconsistent testimony of a highly incentivized snitch," that defense counsel rendered ineffective assistance of counsel when counsel failed to request a cautionary jury instruction related to Codefendant's testimony, and that the district court erred in failing to properly inquire into the nature of a conflict Crespo developed with defense counsel. We conclude there was sufficient evidence to convict Crespo of all charges, that defense counsel rendered effective assistance, and that the district court adequately inquired into the nature of the conflict between Crespo and his defense counsel. Accordingly, we affirm.

BACKGROUND

*The Murder*

¶3 Crespo was a drug dealer who sold drugs to Victim.[1] Crespo and Victim were friends. But a few days before Victim's murder, she reported to the police that Crespo had raped her. Codefendant, who dealt drugs for Crespo, testified that both he and Crespo believed Victim's accusation was an attempt to avoid paying her drug debt to Crespo. Though Crespo had informed Codefendant that he had already discussed the rape accusation with Victim and that they worked out the issue, the person who drove Crespo during his drug runs (Driver),

---

1. "On appeal, we review the record facts in a light most favorable to the jury's verdict and recite the facts accordingly." *State v. Holgate*, 2000 UT 74, ¶ 2, 10 P.3d 346 (citation and internal quotation marks omitted).

testified that Crespo was angry about the accusation the day of Victim's murder. During one of their drives, Crespo called Victim's neighbor (Neighbor), another of his customers, to ask if he could borrow a gun, but Neighbor did not have a gun to lend. Neighbor testified that Crespo did not mention why he needed a gun, but that reason soon became apparent. Crespo then made another phone call, during which he expressed his anger about Victim's rape allegation and said, "Dead bitches can't talk."

¶4 On the night of the murder,[2] Crespo, Codefendant, Driver, and others met at a hotel to drink alcohol and use drugs. During this time, Victim and Codefendant exchanged text messages and phone calls related to her desire to buy drugs, the drugs Codefendant had available, and when he would bring them to Victim.

¶5 Before going to Victim's apartment, Crespo and Codefendant spoke with another individual at the hotel, Friend, about guns and ammunition. Friend loaned a Phoenix .22 caliber gun to Codefendant, assuming it was for safety or for use as a scare tactic. Crespo, who had obtained a gun before meeting the others at the hotel, offered Friend one hundred dollars' worth of cocaine in exchange for .22 caliber ammunition. After collecting the guns and ammunition, Driver drove Crespo and Codefendant to Victim's apartment.

¶6 During the drive, Crespo told Codefendant to convince Victim not to press charges for rape. He gave Codefendant cocaine to give to Victim, free of charge, to entice her to allow Codefendant inside her apartment for a conversation. Crespo

---

2. Victim's murder occurred in the early morning hours of the day, between 3:24 and 3:56 a.m. But because the events leading to her murder began the evening before, this opinion refers to the period surrounding the murder as the "night of the murder."

also said that while Codefendant met with Victim, Crespo would visit another friend in the area, waiting to hear whether Victim wanted to discuss the accusation with him further. Codefendant continued to text Victim that he was on his way to her apartment with the drugs she requested. At 3:24 a.m., Victim, still waiting, sent a text asking, "Where are you?"

¶7     Just before reaching Victim's street, Crespo told Driver to park a block away from her apartment, even though he usually parked in front of it. Codefendant and Crespo exited the car and, at first, walked in opposite directions. According to Driver, Crespo originally walked toward another friend's house, but after about thirty seconds turned around and walked toward Victim's apartment. Private security cameras installed on a house where Driver parked his car corroborated Driver's account of this event.

¶8     Sometime between 3:24 and 3:56 a.m., Codefendant arrived at Victim's apartment. Crespo's plan to offer her free cocaine was successful, and she invited Codefendant inside to smoke it. They began smoking, but their conversation about the rape accusation did not get far. Victim said that "there [was] no way in heaven to hell" she would ever talk to or see Crespo again, and she refused to recant her accusation. Codefendant did not push her on this and said he would let Crespo know how she felt. But before he left, Crespo, who Codefendant testified was waiting outside the door listening to the conversation, "flew through the door with his gun drawn," pointing it first at Codefendant then at Victim. He walked closer to Victim and started shooting. Codefendant claimed he "blacked out" when the shooting began, and it was as though he "saw it but [did not] remember seeing it." The next thing he remembered was standing at the front door and listening as more shots were fired before Crespo pushed him, saying, "Come on, let's get out of here."

¶9     They both ran from the apartment toward a gas station rather than back to Driver's car. When Codefendant reached the gas station, he deleted his text message conversation with Victim but, at 3:56 a.m., sent her a final text saying, "I'm not coming" in an effort "to hide the fact" that he was at Victim's apartment when she was murdered. Codefendant ordered a taxicab to drive him and Crespo back to the hotel.

¶10    Neighbor heard the gunshots and went to Victim's apartment to check on her. He found her lying behind the front door, bleeding from her head, and checked for a pulse while calling 911. When the dispatcher asked Neighbor to attempt to resuscitate Victim, he informed the dispatcher she had no pulse. Victim was pronounced dead on the scene and had sustained three gunshot wounds. She had been shot in the arm, the chest (puncturing a lung and her heart and lodging in her spine), and the head. The wounds to Victim's chest and head were independently lethal.

¶11    Meanwhile, Driver waited at his car for Crespo and Codefendant for about forty-five minutes, unaware of the events that had transpired or that Crespo and Codefendant had taken a taxicab to the hotel. Driver eventually grew impatient and drove past Victim's apartment in an effort to find his companions, but instead discovered police cars and an ambulance. When he returned to the hotel room and saw Crespo and Codefendant already there, he was upset and had "a million questions" about what happened but refrained from asking them after Crespo gave him a look that Friend interpreted as: "I'll talk to you later." Crespo fell asleep soon after Driver returned to the hotel while Codefendant attempted to create an alibi for everyone at the hotel to agree upon.

¶12    The next day, Driver drove Friend to a fast food restaurant and noticed that Friend's gun, which he had allowed Codefendant to borrow the night before, was on the floor of the

car. Driver asked Friend why he would bring the gun, and Friend responded, "I didn't bring that." Driver became worried because Codefendant had not been in his car since the previous evening. The two men suspected Codefendant might be trying to frame Driver, so Driver decided to thoroughly search his car. During his search, Driver found some keys that Codefendant asked him to hold onto the night before, but he had refused to do so. He also found women's clothing he did not recognize and had not been there the previous evening.

*The Investigation*

¶13    During the next few months, the police investigated Victim's murder. Codefendant contemplated turning himself in but did not do so. And at trial, Codefendant admitted he had been "rather deceitful" in his initial police interviews. In each interview, Codefendant provided more details regarding the events surrounding the murder. First, he claimed that he never went into Victim's apartment but had stayed outside and that only Crespo went inside. In subsequent interviews, he admitted bringing the gun he had borrowed from Friend to Victim's apartment. Then, in his final interview, he admitted he entered her apartment to smoke crack cocaine and claimed that his fingerprints were likely on the murder weapon because he had loaded Crespo's gun.

¶14    The police recovered the gun Codefendant had borrowed from Friend, compared the ballistics from the crime scene, and concluded it was not the murder weapon. The ballistics expert testified that the casings recovered from the crime scene were .22 caliber casings and they were all fired from the same gun. Crespo's .22 caliber gun was never recovered. Neither was the murder weapon.

¶15    Crespo was charged with murder; aggravated burglary; and purchase, transfer, possession, or use of a firearm by a restricted person. Codefendant was charged with murder;

aggravated burglary; and obstruction of justice with a gun enhancement for the possession of a firearm by a restricted person.[3] Codefendant entered into a "conditional agreement" with the State to testify truthfully against Crespo at trial and pled guilty to the remaining charges in exchange for the State dismissing his murder charge.

*The Trial*

¶16 Crespo's jury trial lasted four days. On the second day of trial, Crespo attempted to dismiss his two appointed defense attorneys. He informed the court that he had received only "half" of the "discovery papers," had not had a chance to examine a piece of evidence admitted at trial, specifically, a hooded sweatshirt with blood on it that Codefendant wore the night of the murder, and felt his counsel were his "enemies." The court explained that the hooded sweatshirt was in the State's possession and that he could have access to it during a break in the trial. The court then asked Crespo what he thought he had not received and asked how not having those items harmed him. Crespo said only that he "want[ed] to know what[ was] going on" in his case. Crespo insisted he did not want his counsel to represent him, so the court engaged in a commonly used colloquy for defendants who choose to represent themselves.

¶17 As the court began the colloquy, the State suggested that Crespo have a "cooling down session" with his counsel. The prosecutor then commented, "[T]hese two lawyers are fine lawyers, some of the top lawyers in the state. [One of them] has handled some of the top [capital murder] cases in this state."

---

3. Driver was also charged with aggravated burglary, but those charges were dropped due to a lack of evidence and because he was willing to testify truthfully against "the more culpable parties."

Crespo was adamant about not wanting to talk to his counsel, but the court encouraged him to do so and provided him the opportunity to view the hooded sweatshirt he claimed he had not seen. After Crespo viewed the evidence and talked with his counsel, the court said, "You do have a right to represent yourself. Where are you at right now? What do you think?" Crespo responded, "We proceed like this," and defense counsel continued to represent him through the remainder of the trial.

¶18    Before the case was submitted to the jury, defense counsel moved for a directed verdict, arguing that the defense had shown that Codefendant's testimony was "inherently unreliable and not credible." Defense counsel explained that Codefendant gave "numerous inconsistent statements" and, as a result of his "deal to have his murder charge[] dismissed for testifying," he had motivation to fabricate his testimony. In making this argument, defense counsel pointed to Codefendant's concession that he erased the text messages that informed Victim of his imminent arrival with drugs and then, in an effort to hide that he was in the apartment when she was murdered, sent her a message saying, "I'm not coming." In addition, other witnesses testified Codefendant was the person who sought an alibi and planted evidence in Driver's car. The district court denied the motion because Codefendant's testimony was "corroborated by not only the ballistics experts but the other individuals who were there that night and discussed where everybody went at what time, . . . who got picked up . . . , and then it was corroborated by the texts and phone calls."

¶19    During closing arguments, defense counsel highlighted the inconsistencies in Codefendant's testimony and explained there was more evidence to suggest Codefendant murdered Victim. Defense counsel also reviewed the witness credibility jury instruction, line-by-line, and applied it directly to Codefendant's testimony. For example, defense counsel said:

> [T]here's a whole list of things here to take into account, but a few of them are like, does the witness have something to gain or lose in this case? *Yeah. A lifetime in prison or not.* Does the witness have a reason to lie or slant his testimony? *Yeah, he's the murderer.* He's going to plead guilty to [aggravated burglary].

(Emphases added.) Defense counsel then asked, "Was . . . [Codefendant's] testimony consistent over time?" and explained that even Codefendant "had to admit" that he provided "a totally different story" at trial than he did in his interviews with police. Defense counsel also pointed out that the jury instruction allowed the jury to disbelieve part or all of the testimony of any witness and encouraged the jury to completely disregard Codefendant's testimony. The remainder of defense counsel's closing argument focused on the inconsistencies between the evidence and Codefendant's testimony, and the contradictions between his statements to the police, the trial testimony, and the testimony of other witnesses. Defense counsel concluded the argument by stating that the totality of the evidence supported finding that Codefendant was the murderer and that the jury should acquit Crespo.

¶20    The jury was unpersuaded and convicted Crespo of murder and aggravated burglary.[4] Crespo timely appealed.

---

4. The jury was instructed to return a verdict for only the murder and aggravated burglary charges. Defense counsel submitted to the district court that, based on the guilty verdicts as well as Crespo's prior felony convictions, the court should determine whether Crespo was a restricted person in possession of a firearm. The court found Crespo was a restricted person in possession of a firearm. Crespo does not challenge this decision and we therefore do not address whether it was appropriate.

ISSUES AND STANDARDS OF REVIEW

¶21    Crespo raises four issues on appeal. First, he contends the district court erred in denying his motion for a directed verdict because "the evidence was insufficient to warrant conviction." "We will reverse a guilty verdict only when the evidence . . . is sufficiently inconclusive or inherently improbable that reasonable minds must have entertained a reasonable doubt that the defendant committed the crime of which he or she was convicted." *State v. MacNeill*, 2017 UT App 48, ¶ 51, 397 P.3d 626 (citation and internal quotation marks omitted).

¶22    Second, Crespo contends that "[d]efense counsel ineffectively failed to request an instruction that the jury should cautiously view [Codefendant's] testimony."[5] "When a claim of ineffective assistance of counsel is raised for the first time on

---

5. Crespo also maintains the district court plainly erred in failing to sua sponte offer the cautionary jury instruction. Because defense counsel stated that he did not have any objections to the jury instructions at trial, the invited error doctrine precludes us from reviewing this claim under plain error. *See State v. Winfield*, 2006 UT 4, ¶¶ 14–15, 128 P.3d 1171 ("[U]nder the doctrine of invited error, we have declined to engage in even plain error review when counsel, either by statement or act, affirmatively represented to the [district] court that he or she had no objection to the [proceedings]." (third alteration in original) (citation and internal quotation marks omitted)); *see also State v. Hamilton*, 2003 UT 22, ¶ 54, 70 P.3d 111 (explaining that we are precluded from reviewing a jury instruction under the manifest injustice exception "if counsel, either by statement or act, affirmatively represented to the court that he or she had no objection to the jury instruction"). Therefore, we address the asserted error with respect to the cautionary jury instruction only in the context of Crespo's ineffective assistance of counsel claim.

appeal, there is no lower court ruling to review and we must decide whether the defendant was deprived of the effective assistance of counsel as a matter of law." *State v. Craft*, 2017 UT App 87, ¶ 15, 397 P.3d 889 (citation and internal quotation marks omitted). To prevail on a claim of ineffective assistance of counsel, the defendant must demonstrate "that counsel's performance was deficient" and that the "deficient performance was prejudicial—i.e., that it affected the outcome of the case." *See State v. Litherland*, 2000 UT 76, ¶ 19, 12 P.3d 92 (citing *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984)).

¶23   Third, Crespo contends the "[district] court plainly erred in failing to properly inquire into the nature of the conflict between defense counsel and [Crespo]." "To demonstrate plain error, a defendant must establish that (i) an error exists; (ii) the error should have been obvious to the [district] court; and (iii) the error is harmful, i.e., absent the error, there is a reasonable likelihood of a more favorable outcome for the appellant." *State v. Dean*, 2004 UT 63, ¶ 15, 95 P.3d 276 (citation and internal quotation marks omitted).

¶24   Finally, Crespo has filed a rule 23B motion to remand the case to the district court to "supplement the record with evidence regarding [his] dissatisfaction with [defense] counsel." A remand under rule 23B is "available only upon a nonspeculative allegation of facts, not fully appearing in the record on appeal, which, if true, could support a determination that counsel was ineffective." Utah R. App. P. 23B(a).

ANALYSIS

I. Sufficiency of the Evidence

¶25   Crespo contends the district court erred in denying his motion for a directed verdict because the evidence was insufficient to support his murder conviction. Specifically,

Crespo maintains the only evidence presented that placed him in Victim's apartment and as the person who fired the gun came from the "inconsistent testimony of a highly incentivized snitch"—Codefendant. When considering a sufficiency of the evidence claim, "we review the evidence and all inferences which may reasonably be drawn from it in the light most favorable to the verdict of the jury." *State v. Nielsen*, 2014 UT 10, ¶ 46, 326 P.3d 645 (citation and internal quotation marks omitted). This court "must sustain the [district] court's judgment unless it is against the clear weight of the evidence, or if the appellate court otherwise reaches a definite and firm conviction that a mistake has been made." *State v. Larsen*, 2000 UT App 106, ¶ 10, 999 P.2d 1252 (citation and internal quotation marks omitted).

¶26 Crespo argues this court should reverse his conviction because Codefendant's testimony "'suffered from multiple inconsistencies,'" conflicted with other evidence, and was thus "'incredibly dubious and . . . apparently false.'" (Quoting *State v. Robbins*, 2009 UT 23, ¶¶ 8, 18, 210 P.3d 288.)

¶27 In *Robbins*, a minor alleged that her stepfather sexually abused her, but at trial, her "recollection of the alleged sexual abuse incident suffered from multiple inconsistences," including changing "the age at which the abuse occurred," her description of what she was wearing, and the purported threats her stepfather made if she told anyone about the abuse. *Robbins*, 2009 UT 23, ¶¶ 1, 8–9. To compensate for the inconsistencies, the minor said "she had a hearing problem like her grandfather," which was "objectively not true." *Id.* ¶ 8. A jury convicted Robbins, and this court affirmed the conviction, holding that the district court "could not disregard her testimony as inherently improbable." *Id.* ¶ 2 (citing *State v. Robbins*, 2006 UT App 324, ¶¶ 11, 19, 142 P.3d 589). Our supreme court reversed the conviction and clarified the "inherent improbability standard" to allow judges to reassess the credibility of a witness's testimony

when it is "the sole evidence that a crime was even committed" and "there is a complete lack of circumstantial evidence." *Id.* ¶¶ 18, 23.

¶28 The *Robbins* inherent improbability test does not apply here. First, there was circumstantial evidence presented to the jury that supported finding Crespo had perpetrated the crimes charged. *Cf. id.* ¶ 18. Although Codefendant was the only witness to identify Crespo as Victim's murderer, there were other "testifying witnesses that the jury could have relied upon in reaching its verdict." *See Moore v. State*, 27 N.E.3d 749, 757–58 (Ind. 2015) (concluding that "the first factor of the incredible dubiosity rule has not been met because there were multiple testifying witnesses that the jury could have relied upon in reaching its verdict"). Driver testified that, on the day Victim was murdered, Crespo was angry about the rape accusation and told an acquaintance over the phone, "Dead bitches can't talk." After that, Crespo called Neighbor who testified that Crespo asked if Neighbor had a gun he could lend Crespo, but to no avail. Later that same day, Crespo told Codefendant that Codefendant had to get a gun for their next drug run, which he obtained from Friend. Friend also gave Crespo extra .22 caliber ammunition for the gun he had obtained. Shortly after that, Driver drove Crespo and Codefendant near Victim's apartment; but instead of parking in front of her apartment as usual, Crespo asked Driver to park one block away. Crespo then told Driver and Codefendant he was going to visit a different friend while Codefendant visited Victim. But Driver, who stayed with the car, watched Crespo walk toward Victim's apartment rather than in the direction of his other friend's house. When Crespo and Codefendant did not return to the car after about forty-five minutes, Driver returned to the hotel room, where Crespo and Codefendant were waiting.

¶29 Not only were there witnesses who testified that Crespo had a gun and went to Victim's apartment the night of the

murder, other evidence corroborated that testimony. For example, a video recording from nearby security cameras corroborated Driver's and Codefendant's testimony about Crespo walking toward Victim's apartment. At trial, the State played portions of the video, and Codefendant identified the three of them as the men who appeared in the video recording.

¶30 The ballistics evidence was also critical because it excluded Codefendant's gun as the murder weapon. The expert ballistics witness examined the three cartridge casings and confirmed they were fired from the same gun, but not Codefendant's borrowed gun. Crespo's gun was never found; no murder weapon was recovered.

¶31 Because other circumstantial evidence existed to corroborate Codefendant's account of the events, the *Robbins* improbability test does not apply.

¶32 Crespo nonetheless argues that Codefendant's testimony was "purchased" by the State's dismissal of the murder charge against him and was inconsistent because Codefendant changed his account of the events each time he was interviewed by police and added new information to his account during the trial. Crespo also argues that Codefendant's testimony was inconsistent with that of other witnesses. Though there may have been some inconsistencies between each witness's testimony and Codefendant's, the key pieces of information—Crespo's asking Neighbor for a gun, Crespo's possession of a gun the night of the murder, Crespo's asking Friend for extra ammunition and a gun for Codefendant, Crespo's providing cocaine to entice Victim to allow Codefendant into her apartment, Crespo's directing Driver to park in an unusual location, and Crespo's walking toward Victim's apartment minutes before the murder—were all corroborated through the testimony of other witnesses at trial.

¶33　Crespo argues that Codefendant's testimony was "self-serving," "inherently improbable, biased, and incredibly dubious," but he admits that, although it was corroborated to some extent, the evidence "did not actually link Crespo to the shooting itself, but very well could have been perceived by the jury that way." It is the "exclusive function of the jury to weigh the evidence and to determine the credibility of the witnesses," and "[s]o long as there is some evidence, including reasonable inferences, from which findings of all the requisite elements of the crime can reasonably be made," we will not overturn a jury's verdict. *State v. Davis*, 2014 UT App 77, ¶ 4, 324 P.3d 678 (citation and internal quotation marks omitted). In this case, the circumstantial and other evidence presented to the jury was sufficient for it to reasonably infer that Crespo committed the murder and aggravated burglary.[6]

## II. Defense Counsel's Failure to Request a Cautionary Jury Instruction

¶34　Crespo contends defense counsel "ineffectively failed to request" a cautionary jury instruction relating to Codefendant's testimony. To prevail on a claim of ineffective assistance of counsel, a defendant must show "counsel's performance was deficient" and that the "deficient performance was prejudicial—i.e., that it affected the outcome of the case." *See State v.*

---

6. We acknowledge that the evidence presented could have led the jury to acquit Crespo, but it is within the province of the jury to weigh the evidence and the credibility of each witness, and we will not second-guess the jury's conclusion. *See State v. Maama*, 2015 UT App 235, ¶ 43, 359 P.3d 1272 ("[I]n reviewing the sufficiency of the evidence, we refuse to re-evaluate the credibility of witnesses or second-guess the jury's conclusion." (alteration in original) (citation and internal quotation marks omitted)).

*Litherland*, 2000 UT 76, ¶ 19, 12 P.3d 92 (citing *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984)). To show that defense counsel's performance was deficient, the defendant must persuade the court "that there was *no conceivable tactical basis* for counsel's actions." *State v. Clark*, 2004 UT 25, ¶ 6, 89 P.3d 162 (citation and internal quotation marks omitted).

¶35    In this case, Crespo has failed to demonstrate that defense counsel's failure to request a cautionary jury instruction was deficient. Crespo asserts, "Utah law requires the jury to be instructed that an accomplice's 'uncorroborated testimony should be viewed with caution' if that testimony is 'self[-]contradictory, uncertain or improbable.'" (Quoting Utah Code Ann. § 77-17-7(2) (LexisNexis 2012)). We agree with Crespo but note such a cautionary instruction is not required if the district court does not find the accomplice's uncorroborated testimony to be "self[-]contradictory, uncertain, or improbable." Utah Code Ann. § 77-17-7(2). It falls within the district court's discretion to instruct the jury to view uncorroborated testimony with caution if no such findings are made. *See id.*

¶36    Here, the district court did not find that Codefendant's testimony was self-contradictory, uncertain, or improbable. To the contrary, when defense counsel moved for a directed verdict arguing that Codefendant's testimony was "inherently unreliable and not credible," the court denied the motion, finding the testimony was "corroborated by not only the ballistics experts but the other individuals who were there that night." It was therefore within the district court's discretion to deny a cautionary jury instruction. *See id.*; *see also Mulder v. State*, 2016 UT App 207, ¶ 23, 385 P.3d 708 (explaining that "even if trial counsel had requested a cautionary instruction, the [district] court could have exercised its discretion and denied such a request"). Moreover, this court has previously concluded that, where the "testimony is corroborated, we would of course be especially reluctant to find an abuse of discretion in the failure to

give [a cautionary] instruction." *State v. Guzman*, 2004 UT App 211, ¶ 36, 95 P.3d 302.

¶37    In *Guzman*, this court determined that, even without a cautionary instruction, the jury was "adequately apprised that [the accomplice's] testimony was to be taken with a grain of salt" because the "need for caution was evident from [the accomplice's] own testimony" and the jury received a general instruction evaluating witness credibility. *Id.* ¶¶ 38–39. There, the accomplice admitted that he "lied to the police on numerous occasions" and that "he was allowed to plead guilty to reduced charges in exchange for his testimony at trial against [Guzman]." *Id.* ¶ 37. Similarly to *Guzman*, Codefendant testified that he lied to the police in his interviews and that he received a favorable plea deal, amounting to a dismissal of the murder charge against him, in exchange for testifying against Crespo. Crespo's jury was also furnished with a general instruction related to witness credibility. We conclude that Crespo's jury was adequately apprised of the issues it might consider with respect to the reliability of Codefendant's testimony.

¶38    In closing argument, defense counsel covered the same points as a cautionary jury instruction related to witness credibility would have covered. Counsel referred to the general witness-credibility instruction, then read and applied the substantive questions within the instruction to Codefendant's testimony:

> [D]oes the witness have something to gain or lose in this case? *Yeah. A lifetime in prison or not.* Does the witness have a reason to lie or slant his testimony? *Yeah, he's the murderer.* [Codefendant] is going to plead guilty to entering her home with intent to commit an assault with a gun.

(Emphases added.) Defense counsel then asked rhetorically whether the "witness's testimony was consistent over time."

Counsel explained that the witnesses, including Codefendant, testified Codefendant gave "a totally different story" at trial compared to his initial interviews with the police. Defense counsel concluded his jury instruction discussion by stating that the instruction allowed the jurors to believe as much or as little of each witness's testimony as it deemed appropriate and asked the jurors to completely disregard Codefendant's testimony. He supported this by saying, "I can't imagine a . . . stronger incentive to fabricate a story than [']we'll either send you to prison for life or . . . dismiss the charge.[']" He then directed the jury to the evidence of the text messages between Codefendant and Victim, reiterating that Codefendant texted Victim in the hours preceding her murder to let her know that he would bring her the drugs she wanted, then deleted those messages after her murder and sent one final text saying, "I'm not coming." Defense counsel spent the remainder of the closing argument demonstrating that the evidence supported finding that Codefendant was the murderer, not Crespo, and that Codefendant was not a credible witness.

¶39   Because defense counsel effectively explained the same details of a cautionary instruction by applying specific evidence as well as Codefendant's testimony directly to the general witness credibility instruction, we do not see how his failure to request a cautionary instruction was deficient. *See Guzman*, 2004 UT App 211, ¶ 38. For the same reason, we cannot conclude defense counsel's performance prejudiced Crespo's trial.[7]

---

7. Crespo did not address the prejudice element other than to state that, absent a cautionary instruction, "the jury likely gave [Codefendant's testimony] greater weight than they are entitled to under the law. This error cannot be harmless given that [Codefendant's] testimony was the only evidence sustaining Crespo's conviction." As we have explained, *see supra* ¶¶ 28–33, Codefendant's testimony was not the only evidence supporting

(continued…)

III. Crespo's Dissatisfaction with Defense Counsel

¶40    Crespo contends the district court "[plainly] erred in failing to properly inquire into the nature of the conflict [with] defense counsel." He claims that he received only "half of the discovery paperwork," that he did not see a particular piece of physical evidence before trial, and that counsel did not ask "specific questions" that he wanted them to ask. He asserts that the court "did not take sufficient steps to apprise itself of the nature of the conflict and engaged in only perfunctory questioning."

¶41    To demonstrate plain error, Crespo must show "(i) an error exists; (ii) the error should have been obvious to the [district] court; and (iii) the error is harmful, i.e., absent the error, there is a reasonable likelihood of a more favorable outcome for the appellant." *State v. Dean*, 2004 UT 63, ¶ 15, 95 P.3d 276 (citation and internal quotation marks omitted). Because we conclude that no error existed, we address only the first prong of the plain error test.

¶42    When dissatisfaction with appointed counsel is expressed, "the court must make some reasonable, non-suggestive efforts to determine the nature of the defendant's complaints and to apprise itself of the facts necessary to determine whether the defendant's relationship with his or her appointed attorney has

---

(…continued)

his conviction, and the jury is entitled to give as much weight to a witness's testimony as it deems appropriate, *see State v. Davis*, 2014 UT App 77, ¶ 4, 324 P.3d 678 ("So long as there is some evidence, including reasonable inferences, from which findings of all the requisite elements of the crime can reasonably be made, our inquiry stops." (citation and internal quotation marks omitted)).

deteriorated to the point that sound discretion requires substitution" in order to comply with the right to counsel guaranteed by the Sixth Amendment to the United States Constitution. *State v. Pursifell*, 746 P.2d 270, 273 (Utah Ct. App. 1987). This is a fact-intensive inquiry; indeed, we have declined to "prescribe a checklist which [district] courts must run through if any indicia of dissatisfaction should emerge." *Id.*

¶43 In the jury's presence, Crespo said, "I don't want these people to represent me. I don't want them to defend me." The district court immediately excused the jury and inquired into Crespo's concerns. Crespo advised the court he was upset that he had not personally received all of the discovery to which his defense was entitled and had not yet had the chance to look at some of the physical evidence. The only piece of physical evidence Crespo was concerned about was Codefendant's hooded sweatshirt that had blood on it. The court explained that it was in the State's possession as one of its exhibits and that Crespo would have the opportunity to look at it during the break.[8]

¶44 As Crespo further expressed his concern about having not received all of the paperwork, the court asked him why he felt that a failure to receive certain paperwork had harmed him. Crespo responded that he did not feel that he knew what was going on with his case and that his counsel were his "enemies." The court explained that, if Crespo chose to fire appointed counsel, it would have to declare a mistrial, and he would have to wait months for another trial. The district court began the colloquy, but the State interrupted and recommended a "cooling off" period. The court agreed it would be best to give Crespo

---

8. The court seemed to imply that, because defense counsel did not have possession of the hooded sweatshirt, this was not a reason for Crespo to be upset with his counsel.

time to discuss his concerns with his counsel before finishing the colloquy.

¶45 The court also asked defense counsel specific questions related to Crespo's concerns. Defense counsel explained, "[T]here's pages in the discovery that have no value to a defendant . . . that he didn't get, but he certainly has . . . access to what I consider to be substantial discovery." After Crespo spoke with his counsel and had an opportunity to view the hooded sweatshirt, the district court informed Crespo that he had the right to represent himself then asked, "Where are you at right now? What do you think?" Crespo responded, "We proceed like this," and defense counsel represented him for the remainder of the trial.

¶46 Based on the record, we cannot agree with Crespo that the district court "made virtually no inquiry" into the nature of the conflict with defense counsel. Instead, the record shows the court made reasonable efforts to apprise itself of the basis for Crespo's complaints to determine whether the relationship had "deteriorated to the point that sound discretion require[d] substitution" of counsel. *See Pursifell*, 746 P.2d at 273. We therefore conclude there was no plain error.

IV. The Rule 23B Remand

¶47 Crespo filed a Utah Rule of Appellate Procedure 23B motion to remand to "supplement the record with evidence regarding Mr. Crespo's dissatisfaction with counsel." A remand under rule 23B is "available upon a nonspeculative allegation of facts, not fully appearing in the record on appeal, which, if true, could support a determination that counsel was ineffective." Utah R. App. P. 23B(a). The motion (1) "must be supported by affidavits alleging facts outside the existing record," *State v. Tirado*, 2017 UT App 31, ¶ 14, 392 P.3d 926, (2) "the alleged facts must be non-speculative," *id.*, and (3) "these allegations could support a determination that counsel's ineffectiveness prejudiced

the result," *State v. Griffin*, 2015 UT 18, ¶ 30. Our supreme court has explained that, "[i]n the context of rule 23B, speculative allegations are those that have little basis in articulable facts but instead rest on generalized assertions." *Id.* ¶ 19. Crespo's motion and supporting affidavit amount to speculative allegations.

¶48  Crespo asserts that the "record needs to be developed as to what paperwork defense counsel admittedly failed to give Mr. Crespo, whether counsel prepared the case for trial with Mr. Crespo[,] and what the parties discussed outside the courtroom." But he has failed to provide non-speculative facts to support the need for a remand. For example, Crespo and his appellate counsel have had access to the record for this appeal, including the "discovery papers," but have not provided examples of discovery he did not receive or how this could have affected the result of his trial.[9] In addition, his affidavit explains that, based on conversations with counsel, off the record, he felt coerced into "giving [counsel] another chance" and to not testify on his own behalf at trial. But he has not explained the nature of

---

9. Crespo explained in his affidavit that he "did not receive some of the police interviews from witnesses, including one where [Codefendant] says that we came back to the hotel separately, where he testified we came back together." He asserts that, if he had had this information, he could have told counsel "much of the evidence they needed to present or question witnesses about." We cannot find this interview in the record. But, now that he is aware of this interview, Crespo has still failed to provide us with any "additional evidence [counsel] needed to present" or questions he could have provided for counsel to ask the witnesses, much less how this could have changed the result of his trial. And as explained previously, counsel managed to get Codefendant to repeatedly concede he lied to the police in his initial interviews and that his trial testimony differed from those interviews in many respects.

those conversations or what was said that made him feel coerced.

¶49 The purpose of a remand is not to allow for a "fishing expedition" to discover new, non-record facts but to provide the opportunity to supplement the record with facts already discovered that could support a claim of ineffective assistance of counsel. *See id.* ¶¶ 19, 29–30 (concluding remand was proper because the allegations and supporting affidavits "could support a determination that counsel's ineffectiveness prejudiced the result"). Crespo's claims are purely speculative and do not support a rule 23B remand. Accordingly, we deny the motion.

CONCLUSION

¶50 We conclude there was sufficient evidence for a jury to convict Crespo on all three charges. Even though Codefendant's testimony changed over time, his testimony was corroborated by key pieces of evidence at trial. We also conclude that Crespo's defense counsel was not ineffective for failing to request a cautionary jury instruction because it was not required under Utah law, and defense counsel's closing arguments had the same effect as if the court provided the jury with such an instruction regarding, specifically, Codefendant's credibility. Finally, we conclude that the district court adequately inquired into the nature of Crespo's dissatisfaction with his defense counsel.

¶51 Affirmed.

—————————