2020 UT App 6

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
KATHLEEN SEVASTOPOULOS,
Appellant.

Opinion
No. 20180452-CA
Filed January 3, 2020

Third District Court, Salt Lake Department
The Honorable James T. Blanch
No. 161904929

Nathalie S. Skibine, Attorney for Appellant

Sean D. Reyes and William M. Hains, Attorneys
for Appellee

JUDGE DAVID N. MORTENSEN authored this Opinion, in which
JUDGES GREGORY K. ORME and DIANA HAGEN concurred.

MORTENSEN, Judge:

¶1      After Kathleen Sevastopoulos's parents (Parents) confronted her for making unauthorized transfers from their bank account, they noticed a slew of additional suspicious transactions. Parents ultimately discovered that Sevastopoulos had stolen over $246,000 from them through over 200 unauthorized transfers to pay her credit card bills. After criminal charges were brought against her, Sevastopoulos pled guilty to two counts: theft and theft by deception. As a condition of Sevastopoulos's probation, the district court entered a restitution order. Sevastopoulos appeals this order, arguing that the district court made various errors in calculating restitution and that her counsel was constitutionally ineffective. Because we conclude that the only reversible error was the district court's inclusion of

two of the numerous transfers in the restitution order, we affirm in part, reverse in part, and remand this matter for entry of an amended restitution order consistent with our opinion.

BACKGROUND

¶2    When Parents noticed suspicious transactions on their bank statements, Sevastopoulos's mother (Mother) asked Sevastopoulos about the transactions. Sevastopoulos admitted to making the transactions. After their discussion, Mother thought they "had it all cleared up." But unexplained charges continued to appear on Parents' bank statements. Parents noticed payments for credit cards they did not own. This prompted Mother to send Sevastopoulos a letter with an attached bank statement. On the bank statement, Mother indicated that she had authorized two of the transactions—totaling $657.43—but that seven of the transactions were a mystery to her. Although Mother had given Sevastopoulos money in the past, she had always done so through handwritten checks. Parents would later testify that they always used paper checks and that they did not know how to effectuate electronic transfers. These suspicious transactions were processed as automated clearing house transfers, which are electronic payments made using an account number, routing number, and often—but not invariably—a check number. The suspicious transactions were all payments made to Sevastopoulos's credit card accounts with American Express, Bank of America, Nordstrom, Chase, and U.S. Bank (Credit Card Companies).

*The Lawsuits*

¶3    Parents hired an attorney, who in turn hired a forensic accountant (Accountant) to assist the attorney with looking into the unexplained payments. The attorney contacted the Credit Card Companies to obtain refunds, but most of them were "extremely difficult" to work with. The attorney then filed

lawsuits against all the Credit Card Companies but one, which was "easier to work with." Most of the Credit Card Companies settled the lawsuits by refunding Parents a portion of the unauthorized transfers. However, the attorney dropped the lawsuit against U.S. Bank after it produced authorized, handwritten checks for the disputed transfers. But after further review, the Accountant identified unauthorized electronic transfers involving U.S. Bank, totaling $9,390. During the lawsuits against the Credit Card Companies, the Accountant identified numerous unauthorized electronic transfers to the Credit Card Companies, amounting to a grand total of $246,937.90. In all, Parents were able to recover $131,701.63 from the Credit Card Companies. The attorney and accountant fees associated with recouping the unauthorized transfers initiated by Sevastopoulos were $40,000.

*The Criminal Investigation*

¶4    The situation was brought to the attention of law enforcement, and a detecitve (Detective) began to investigate. During the investigation, Detective reviewed statements from the Credit Card Companies—some by way of subpoena—and matched the unauthorized transfers from Parents' bank account with the transfers on the statements from the Credit Card Companies. Detective also interviewed Sevastopoulos on several occasions. In these interviews, Sevastopoulos admitted to making approximately 200 transfers from Parents' account to the Credit Card Companies, but she claimed she had permission to do so. To substantiate her claim, she showed Detective the letter Mother had sent her. The letter included Mother's writing: "I'm totally confused about [some] charges which were not made by me." Later, Detective testified that the letter did not appear to give Sevastopoulos permission to make the transfers, stating, "[W]hen I read through this document . . . it didn't seem as though . . . there was really consent given." Based on Detective's investigation, Sevastopoulos was arrested.

¶5 The State initially charged Sevastopoulos with one count of felony theft and two counts of exploitation of a vulnerable adult, but Sevastopoulos ultimately pled guilty to theft and theft by deception, both misdemeanors. The plea agreement listed the basis for both charges as happening "[o]n or about January 17, 2015." It also stated that Sevastopoulos pled guilty to counts one and two, and the amended information listed the offenses as occurring "on or about July 01, 2013, to January 17, 2015." The plea agreement also included a provision that Sevastopoulos would pay "any restitution that may be owed on charges that are dismissed as part of [the] plea agreement." Sevastopoulos also acknowledged, when questioned by the court, that there could be a legal obligation for her to pay restitution to the victims in the case for their financial loss. On August 30, 2017, the court sentenced Sevastopoulos to serve 180 days in jail and placed her on probation, with restitution being a condition thereof. The court reserved the amount of restitution for later determination.

*The Restitution Order*

¶6 The State subsequently filed a motion for restitution. Sevastopoulos objected, claiming that (1) she "never agreed to pay any amount of restitution as part of her plea," (2) she rightfully used the funds, and (3) the matter was at the time a subject of civil litigation involving a family trust, and thus "[r]estitution would be inappropriate under these circumstances." The district court rejected Sevastopoulos's objection, explaining that under *State v. Ogden*, 2018 UT 8, 416 P.3d 1132, there was "nothing about the pending civil action that prevent[ed] th[e] court from going forward and having a restitution hearing." The court then set a restitution hearing for March 20, 2018. On the day of the hearing, Sevastopoulos moved for a continuance, which the court granted. The court also ordered the parties to exchange financial declarations, witness lists, and exhibit lists, which the parties did.

¶7    On April 26, 2018, the court held a full-day evidentiary hearing in which the State presented its evidence, including testimony from Parents, Parents' attorney, the Accountant, and Detective, as well as substantial documentary evidence. The witnesses testified as to their roles in discovering and identifying the fraudulent transfers. Based on the evidence, the district court concluded that Sevastopoulos had proximately caused Parents' financial losses and ordered Sevastopoulos to pay $148,243.27 in restitution. The court arrived at that number by determining that Sevastopoulos stole $246,937.90 from Parents, which it offset by the $131,701.63 that Parents recovered from the Credit Card Companies, equaling $108,243.27 plus the costs of the attorney fees ($38,000) and the accountant fees ($2,000). In its calculation, the court included 219 transfers to the Credit Card Companies: the later-discovered U.S. Bank transfers, 125 transfers with associated check numbers, the two transfers Mother explicitly authorized,[1] and numerous others.

¶8    The district court's restitution order precipitated this appeal.


ISSUES AND STANDARDS OF REVIEW

¶9    Sevastopoulos challenges the restitution order, raising three issues. The first two issues are whether the district court erred when it included the attorney and accountant fees in its restitution order and whether the district court erred when it included the rest of the requested restitution—all 219 transfers— in its order. "We will not disturb a district court's restitution determination unless the court exceeds the authority prescribed by law or abuses its discretion." *State v. Ogden*, 2018 UT 8, ¶ 25, 416 P.3d 1132 (cleaned up); *accord State v. Laycock*, 2009 UT

---

1. We reverse the district court's order as to these two transfers. *See infra* ¶ 18.

53, ¶ 10, 214 P.3d 104. "A restitution order will be overturned for abuse of discretion only if no reasonable person would take the view adopted by the trial court." *State v. Thomas*, 2016 UT App 79, ¶ 4, 372 P.3d 87 (per curiam) (cleaned up).

¶10　The third issue is whether the district court violated Sevastopoulos's constitutional right to due process by conducting a restitution hearing where, as Sevastopoulos argues, "the complicated determinations would be better handled as a civil matter." But Sevastopoulos did not preserve this issue below.[2] Nevertheless, she contends, in the alternative, that her attorney rendered constitutionally ineffective assistance when counsel failed to raise the constitutional law objection she now advances on appeal. We therefore consider this issue under the rubric of ineffective assistance of counsel. "When a claim of ineffective assistance of counsel is raised for the first time on appeal, there is no lower court ruling to review and we must decide whether the defendant was deprived of the effective assistance of counsel as a matter of law." *State v. Crespo*, 2017 UT App 219, ¶ 22, 409 P.3d 99 (cleaned up).

---

2. Sevastopoulos's objection to the restitution hearing was one paragraph long and invoked three reasons for the district court not to proceed: (1) she "never agreed to pay any amount of restitution as part of her plea," (2) she rightfully used the funds, and (3) the matter was at the time a subject of civil litigation, which involved a family trust. Her truncated objection did not articulate any constitutional law issue. Moreover, in discussing *State v. Ogden*, 2018 UT 8, ¶ 27 n.5, 416 P.3d 1132, when overruling Sevastopoulos's objections, the court was not ruling on a constitutional law issue. Rather, it was addressing exactly the objection Sevastopoulos raised: whether the court could move forward despite a simultaneous civil proceeding on a separate matter.

ANALYSIS

I. The Attorney and Accountant Fees

¶11    Sevastopoulos contends that the attorney and accountant fees were improperly included in the district court's restitution order. Under the Crime Victims Restitution Act (Restitution Statute), courts are required to order restitution when a defendant commits a crime that "has resulted in pecuniary damages." Utah Code Ann. § 77-38a-302(1) (LexisNexis 2012). At the relevant time, pecuniary damages were defined as "all demonstrable economic injury, whether or not yet incurred, which a person could recover in a civil action arising out of the facts or events constituting the defendant's criminal activities."[3] *Id.* § 77-38a-102(6). Thus, what one can recover in a civil action informs our inquiry here.

¶12    Generally, "costs or expenses incurred in the maintenance of, or related to, litigation" are not recoverable in a civil action, unless provided for by contract or statute. *State v. Brown*, 2014 UT 48, ¶¶ 23–24, 342 P.3d 239 (citing Restatement (Second) of Torts § 914(1) (Am. Law Inst. 1979)) (holding that the lost wages and expenses requested by the victim and her mother would not be recoverable in a civil action against the defendant, and therefore they were not compensable as restitution). Likewise, criminal investigative costs are generally not

_____

3. The legislature amended the Restitution Statute in 2016 to "all demonstrable economic injury, whether or not yet incurred, *including those* which a person could recover in a civil action." Utah Code Ann. § 77-38a-102(6) (LexisNexis Supp. 2016) (emphasis added). This seems to indicate that damages are no longer strictly limited to what one could recover in a civil action. However, we analyze the statute as it was in effect at the time of Sevastopoulos's admitted thefts.

recoverable in a civil action. *E.g., State v. Depaoli*, 835 P.2d 162, 165 (Utah 1992).

¶13 However, one exception to these general rules is the "third-party tort rule." *South Sanpitch Co. v. Pack*, 765 P.2d 1279, 1282–83 (Utah Ct. App. 1988) (holding that the attorney fees were recoverable under the third-party tort rule and explaining that "when the natural consequence of one's negligence is another's involvement in a dispute with a third party, attorney fees reasonably incurred in resolving the dispute are recoverable from the negligent party as an element of damages"). Under the third-party tort rule, "[o]ne who through the tort of another has been required to act in the protection of his interests by bringing or defending an action against a third person is entitled to recover reasonable compensation for loss of time, attorney fees and other expenditures." Restatement (Second) of Torts § 914(2); *see also State v. Jamieson*, 2017 UT App 236, ¶ 21, 414 P.3d 559 (discussing the third-party tort rule but concluding that it was inapplicable because the victim was compelled to participate in the prosecution pursuant to a subpoena and did not initiate or defend any litigation with third parties), *cert. granted*, 421 P.3d 439 (Utah 2018). Without this exception, the costs of protecting victims' interests resulting from criminal defendants' actions would be inappropriately allocated to the victims themselves—a result that would contradict both equity and the very purposes of the Restitution Statute. *See State v. Ogden*, 2018 UT 8, ¶ 43, 416 P.3d 1132 (explaining that the purposes of the Restitution Statute are to compensate victims, to rehabilitate defendants, and to deter crime).

¶14 Here, the attorney and accountant fees fall directly within the parameters of the third-party tort rule. The fees are recoverable, in this situation, because they were incurred in response to Sevastopoulos's admitted thefts and through the pursuit of litigation against the third-party Credit Card Companies. And although legally immaterial to whether the

third-party tort rule applies, the rule's equity here is relatively easy to identify because Parents ultimately benefitted from the third-party lawsuits. The district court reduced the figure the Accountant identified as stolen—$246,937.90—by $131,701.63 based on the efforts of the attorney and Accountant to protect Parents' financial interests through recovery of a portion of the stolen funds.[4] Thus, not only are the attorney and accountant fees recoverable under the letter of the law, they fall within the spirit of the third-party tort rule as well, which is to incentivize injured parties to protect their interests and to mitigate damages. *See* Restatement (Second) of Torts § 914(2).

¶15 Nevertheless, Sevastopoulos argues that the accountant fees were indistinguishable from investigation fees. However, the crucial distinction here is that Parents paid the Accountant to assist in the lawsuits against the Credit Card Companies, not to assist in Sevastopoulos's criminal prosecution. That the Accountant's work was later helpful to the State in its

---

4. Sevastopoulos benefitted from the third-party lawsuits as well. The State focused its restitution efforts only on Parents—the immediate victims of her fraudulent conduct. So, the amounts disgorged by the Credit Card Companies to Parents were credited against the amount of their losses otherwise recoverable from Sevastopoulos, resulting in a substantially smaller restitution award. The State did not argue that the Credit Card Companies were victims of Sevastopoulos's crimes or that she should have made restitution to the Credit Card Companies for the losses proximately caused by her misappropriation of Parents' funds and ultimately borne by the Credit Card Companies. Thus, we have no occasion to consider whether the "demonstrable economic injury" sustained by the Credit Card Companies could have been included in the restitution award ordered in this case, in addition to the losses ultimately borne by Parents.

prosecution is beside the point of whether Parents are entitled to restitution under the third-party tort rule for the costs that *Parents* incurred.

¶16    Sevastopoulos also argues that the attorney fees are not recoverable in a civil action for conversion, as a matter of law, citing *Broadwater v. Old Republic Surety*, 854 P.2d 527, 534 (Utah 1993). This argument misapprehends *Broadwater*. In *Broadwater*, the plaintiff was not entitled to attorney fees because she proceeded in litigation against the original tortfeasor. *Id.* at 535. However, in coming to this conclusion, our supreme court specifically recognized the difference between the case before it and the situation where a party has to protect its interests through litigation with a third party based on the actions of the original offending party—in other words, the third-party tort rule. *Id.* Thus, *Broadwater* simply is not applicable to this case.

¶17    Accordingly, because we conclude that the attorney and accountant fees would be recoverable in a civil action under the facts of this case, and thus compensable as restitution under the Restitution Statute, we affirm the portion of the restitution order related to the attorney and accountant fees.[5]

---

5. In cases like this one, the district court should ensure not only that the attorney fees were properly calculated, but that "an allocation is made between recoverable fees incurred in litigation with third parties and non-recoverable fees incurred in pursuing the negligent defendant or expended on causes of action not proximately necessitated by that defendant's" actions. *South Sanpitch Co. v. Pack*, 765 P.2d 1279, 1283 (Utah Ct. App. 1988). Here, the attorney and accountant fees were strictly limited to the legal work performed to recover the stolen money from the third-party Credit Card Companies.

II. The Remaining Portions of the Restitution Order

¶18    Sevastopoulos contends that the district court erred by concluding that causation had been established for the entire amount of the requested restitution. Sevastopoulos is correct—and the State concedes—that two transactions totaling $657.43 for which the district court ordered restitution were improper because Mother explicitly authorized them. We therefore reverse the district court's order as to those two transactions. However, we disagree with Sevastopoulos that the court abused its discretion when it included the rest of the transactions in its restitution order.

¶19    "Proximate cause is required to find that a criminal activity has resulted in pecuniary damages" and thus to order restitution. *State v. Ogden*, 2018 UT 8, ¶ 48, 416 P.3d 1132 (cleaned up). "For proximate cause to exist, the relationship between the [particular] act and the injury must be foreseeable." *Id.* ¶ 47 (cleaned up).

¶20    Here, the record reflects that Sevastopoulos proximately caused the pecuniary damage related to the other 217 transfers. Sevastopoulos pled guilty to theft of the funds, and she admitted to Detective on several occasions that she made approximately 200 transfers from Parents' account to the Credit Card Companies. Detective added his testimony that, based on his investigation, the funds were indeed fraudulently transferred. Moreover, Parents testified that the transfers were unauthorized. Finally, the Accountant testified as to his assessment of the fraudulent transfers and calculation of the total amount of stolen money.

¶21    Despite her guilty plea and this evidence, Sevastopoulos maintains that the district court erred in its restitution order. All her arguments on this point focus narrowly on the facts favorable to her, while ignoring important countervailing evidence. We therefore determine that none of Sevastopoulos's

contentions have sufficient merit to reverse the remaining portion of the district court's restitution order, but we address them in turn.

¶22 First, Sevastopoulos argues that because she pled guilty to only two counts of theft and her plea stated that both counts occurred "on or about January 17, 2015," the State did not establish proximate cause on more than two of the transfers. We disagree. We recently addressed a similar argument in *State v. Randall*, 2019 UT App 120, 447 P.3d 1232. In *Randall*, the defendant pled guilty to defrauding numerous investors, but he later argued that his guilty plea did not extend to all 156 victims based on some similar language in his plea agreement. *Id.* ¶ 14. However, we pointed out that the district court acted within its broad discretion in ordering restitution to all 156 victims based on other language in the defendant's plea agreement, the defendant's own admissions of guilt, and the broad nature of the crime—engaging in a pattern of unlawful activity. *Id.* ¶¶ 14–18.

¶23 In this case, like the defendant did in *Randall*, Sevastopoulos focuses too narrowly on the favorable language in her plea agreement. *See id.* ¶ 14. Sevastopoulos's plea agreement also included language that she pled guilty to counts one and two in the amended information, and the amended information listed those offenses as occurring "on or about July 01, 2013, to January 17, 2015." This clearly entails a broader time period than the single date on which Sevastopoulos focuses.[6] The plea

---

6. Sevastopoulos argues that transfers that were made outside of this period should not have been included in the district court's restitution order. However, this argument was neither raised below nor presented to us until Sevastopoulos's reply brief. Other than to note that time was not an element of the offenses, we decline to address this argument any further. *Camco Constr. Inc. v. Utah Baseball Academy Inc.*, 2018 UT App 78, ¶ 42 n.13, 424

(continued…)

agreement also included Sevastopoulos's assent to pay "any restitution that may be owed on charges that are dismissed as part of [the] plea agreement." The State dismissed one count of felony theft and two counts of exploitation of a vulnerable adult, which indicates that there were additional counts—i.e., beyond the two on which Sevastopoulos focuses—that had no financial limits for which Sevastopoulos agreed to be liable. *See* Utah Code Ann. § 76-6-412(1)(a)(i) (LexisNexis 2012) (providing that theft of property is punishable as a second-degree felony when the "value of the property . . . exceeds $5,000"); *id.* § 76-5-111(4)(a) (prohibiting financial exploitation of a vulnerable adult as to any financial amount).

¶24 And like the defendant in *Randall*, Sevastopoulos acknowledged to the district court, both orally and in writing through the plea agreement, that she would have a legal obligation to pay restitution to the victims for their financial loss. 2019 UT App 120, ¶ 15. She also admitted to Detective that she had made the numerous transfers, like the defendant's admission of defrauding the numerous investors in *Randall. Id.* We therefore reject Sevastopoulos's argument that she owes restitution for only two transfers based on her plea agreement. Utah Code Ann. § 77-38a-302(2)(a) ("'Complete restitution' means restitution necessary to compensate a victim for all losses caused by the defendant.").

¶25 Second, Sevastopoulos argues that the district court should not have included restitution for 125 electronic transfers that included check numbers. But a claim that she did not make these transfers would be directly contradicted by her admission

_____

(…continued)
P.3d 1154 ("Issues raised by an appellant in the reply brief that were not presented in the opening brief are considered waived and will not be considered by the appellate court." (cleaned up)).

to Detective that she made approximately 200 transfers because without these 125 transfers, the total number of transfers would be fewer than 100. Also, Parents testified that they never made electronic transfers, and there was evidence that many electronic bank transfers are in fact executed by using check numbers.[7] Therefore, once again, Sevastopoulos ignores the contradictory evidence upon which the district court appropriately based its order.

¶26    Finally, Sevastopoulos argues that the transfers to U.S. Bank were improperly included because even Parents' attorney admitted that the case against U.S. Bank was correctly dismissed. This is only half of the story. After Parents' attorney agreed to dismiss the case, the Accountant looked further into the situation and determined that there were, in fact, unauthorized transfers to U.S. Bank, and the Accountant so testified at the restitution hearing.

¶27    Simply put, Sevastopoulos's arguments are unpersuasive because they do not paint the complete factual picture. Accordingly, because we cannot conclude that the district court erred in determining that Sevastopoulos's conduct proximately caused the financial harm to Parents in connection with the 217 transfers, we affirm its order in this regard. However, as previously stated, we reverse the district court's

---

7. Although the two explicitly authorized transfers had associated check numbers, this does not ipso facto prove a conflict in Parents' testimony about never making electronic transfers because Sevastopoulos could have easily made them electronically with use of the check numbers. Moreover, the "existence of a conflict in the evidence does not render the totality of the evidence insufficient. It is the role of the factfinder to examine and resolve such conflicts." *State v. Black*, 2015 UT App 30, ¶ 19, 344 P.3d 644.

inadvertent inclusion of the two transfers that Mother explicitly authorized.

### III. Ineffective Assistance of Counsel

¶28 Sevastopoulos contends that her counsel was constitutionally ineffective for not raising a constitutional due process objection to the restitution order. To prevail on an ineffective assistance of counsel claim, a defendant must establish both that counsel's performance was objectively deficient and that the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Wilder*, 2018 UT 17, ¶ 17, 420 P.3d 1064. "Because both prongs of the *Strickland* test must be met to establish ineffective assistance of counsel, we need not always address both prongs." *State v. Goode*, 2012 UT App 285, ¶ 7 n.2, 288 P.3d 306; *see also State v. Roberts*, 2019 UT App 9, ¶ 23, 438 P.3d 885 ("In practice, we often skip the question of deficient performance when a defendant cannot show prejudice."). In this case, because Sevastopoulos cannot show prejudice, we do not address the deficient performance prong.

¶29 "To show prejudice in the ineffective assistance of counsel context, the defendant bears the burden of proving . . . that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different." *State v. Beverly*, 2018 UT 60, ¶ 30, 435 P.3d 160 (cleaned up). It is insufficient to show "some conceivable effect on the outcome of the proceeding"; rather, "the likelihood of a different result must be substantial." *Menzies v. State*, 2014 UT 40, ¶ 91, 344 P.3d 581 (cleaned up). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

¶30 Sevastopoulos cannot show prejudice because the evidence against her was sufficiently robust and because she received significant opportunities to contest the ordered

restitution at her hearing. *Compare State v. Weeks*, 2002 UT 98, ¶ 21, 61 P.3d 1000 (holding that "the presentence report sufficiently supported the sentencing court's" restitution order, even though it was "the only evidence presented to the sentencing court"), *with State v. Robinson*, 860 P.2d 979, 982 (Utah Ct. App. 1993) (holding that ordering restitution violated the defendant's right to due process because he "never had an opportunity to raise the issues of whether his improper lane change was the proximate cause of the victims' injuries or whether the victims were comparatively negligent"). The district court based the restitution order on all the evidence outlined above: (1) significant testimony from Parents, Detective, and the Accountant; (2) Sevastopoulos's own admissions and plea agreement; and (3) documentary evidence of the bank transfers. The court also provided Sevastopoulos with ample opportunity to contest the State's restitution evidence: (1) Sevastopoulos had months to prepare; (2) she moved for a continuance on the day of the initial restitution hearing, which the court granted; (3) the court ensured that the parties exchanged financial declarations, witness lists, and exhibit lists; and (4) Sevastopoulos had an opportunity at a full-day hearing to present her case.

¶31   Nevertheless, Sevastopoulos contends that her right to due process was violated because she did not receive the opportunity to utilize interrogatories or depositions. We cannot agree. She never requested to use these discovery tools during the proceedings at the district court. Nor does she explain what evidence they would have unearthed to benefit her cause.

¶32   Moreover, due process was afforded to Sevastopoulos. Due Process is generally defined as providing, "at a minimum, timely and adequate notice and an opportunity to be heard in a meaningful way," *In re Worthen*, 926 P.2d 853, 876 (Utah 1996) (cleaned up), and is a flexible concept of fairness affording procedural protections that a given situation demands, *Dairy Product Services, Inc. v. City of Wellsville*, 2000 UT 81, ¶ 49, 13 P.3d

581. From Sevastopoulos's sentencing on August 30, 2017, which included restitution as a condition of her guilty plea, to the final restitution hearing on April 26, 2018, 239 days had passed. This is longer than the 210 days to complete discovery in a tier 3 civil action claiming damages of $300,000 or more. Utah R. Civ. P. 26(c)(5). Thus, she had notice and abundant time to prepare. Furthermore, the district court afforded Sevastopoulos a full-day evidentiary hearing and required the parties to make significant disclosures. Finally, Sevastopoulos makes no claim that she was precluded from calling any witnesses or offering any particular evidence.

¶33    In short, we cannot conclude that there is a reasonable probability that the outcome of the restitution order would have been different, even if Sevastopoulos's attorney had raised the due process objection, given the strength of the evidence and the process provided to her.

CONCLUSION

¶34    We conclude that the district court erred by including the two transfers that Mother explicitly authorized in the restitution order. We therefore remand the matter for the district court to enter an amended restitution order, reducing the total amount of restitution by $657.43. However, we conclude that the district court did not otherwise err when it included the attorney and accountant fees and remaining transfers in the restitution order. Finally, we conclude that Sevastopoulos's attorney was not constitutionally ineffective.

¶35    Affirmed in part, reversed in part, and remanded.

_____